[No. 27477. Department One. December 21, 1939.]

MASON-WALSH-ATKINSON-KIER COMPANY, *Appellant,* v. OTTO CASE, *as State Treasurer, et al., Respondents.*[1]

[1]Reported in 97 P. (2d) 165.

Graves, Kizer & Graves, for appellant.

The Attorney General and John E. Belcher, Assistant, for respondents.

ROBINSON, J.—Plaintiff was a contractor engaged in construction work on the Grand Coulee dam. In the performance of its work, it used enormous trucks, specially designed and built for the particular job. The trucks were of such size and weight that they could not be lawfully licensed to operate upon the public highways. They were built in Seattle and moved to the site of the work under their own power, under special permission issued by the state highway engineer in accordance with § 10, chapter 309, Laws of 1927, p. 779. These permits directed that the trucks should proceed in caravans, over a designated route, on specified dates, and during daylight hours, all units to be empty and spaced at three hundred feet. Flag-men were to proceed in front of, and behind, the caravans, and all traffic was required to be properly flagged.

Although the trucks were of several types, all of them were wider or heavier, or both wider and heavier, than the law permits to be operated upon a state highway. The maximum width allowed by law is eight feet. All of the seventy-five trucks were in excess of

that, the largest type having a width of nine feet three inches, or more than one-half the width of an eighteen foot pavement. The smallest of the trucks weighed seventeen and one-half tons when loaded, the largest, twenty-seven tons. When empty, the smallest weighed ten tons, the largest, fourteen and one-half tons. This was from six hundred to eighteen hundred and fifty pounds more per tire than the maximum weight per tire permitted by law.

The permits themselves state: "Permit on acct. over-width & over-weight," and it is admitted that the trucks could not lawfully be operated on a state highway as vehicles for the transportation of property or licensed to so operate, or even moved thereon when empty, except under a written permit issued at the discretion of the state highway engineer. To move them over a county highway, a permit issued by the county commissioners was required by law, and through a city street, permission of the city council.

In the performance of its excavation work at Grand Coulee, the plaintiff used large quantities of gasoline purchased from distributors within the state of Washington. The state tax of five cents per gallon was included in the purchase price. This action was brought to secure a refund equal to the amount of the taxes so paid with respect to gasoline so purchased and used; and the prayer of the complaint is that the director of licenses be required to approve the claims for refund, theretofore filed, in the sum of $68,916.70, and to approve other similar claims, if and when filed, and that the state auditor be ordered to issue a warrant for $68,916.70, and like warrants with respect to refunds accrued, if any, during the pendency of the action, and that the state treasurer be required to pay such warrants when presented for payment, or, in the alternative, that the plaintiff have judgment against the

state for $68,916.70, and further sums which may have accrued.

During the pendency of the action, Phil H. Gallagher has become the treasurer of the state of Washington and Dave S. Cohn, director of licenses, and they are substituted for Otto Case and Harry C. Huse as parties defendant. For convenience, the word "state" will be used throughout the opinion as including all of the defendants.

Since the refunds are claimed with respect to taxes included in purchases made since May 1, 1935, the appeal involves a construction of chapter 58, Laws of 1933, p. 298, as amended by chapter 109, Laws of 1935, p. 269, and further amended by chapter 219, Laws of 1937, p. 1086 (Rem. Rev. Stat. (Sup.), § 8327-1 [P. C. § 7068-71]). It is believed that a resume of previous legislation will be helpful in solving the problem presented.

In 1921, the legislature passed an act (chapter 173, p. 669) providing for an excise tax on the *sale* of liquid fuel used in all forms of internal combustion engines. The distributor was required to make monthly report of his sales and pay a tax of one cent per gallon. This applied to all liquid fuels except kerosene. There was no exemption except as to fuels sold for export. All such taxes went to the credit of the motor vehicle fund, which, by chapter 96, p. 251, passed at the same session, was to be almost wholly used for the paving and construction of roads.

In 1923, the legislature, by chapter 81, p. 242, amended the 1921 act and added several new sections thereto, which contain the rudiments of our present gasoline tax system. It was provided in the new and additional sections that every person, firm, or corporation who should *use* liquid fuel for the purpose of operating motor vehicles upon the public highways should pay

"an excise tax of two cents per gallon upon all such liquid fuel so used." It specifically provided, however, that, if the liquid fuel was used for the purpose of propelling stationary gas engines, farm tractors, or motor boats, or other commercial use, "except in motor vehicles operated or intended to be operated upon any of the public highways of the state," reimbursement should be made by the state treasurer upon claims prepared and filed within the time and in the manner therein set out.

The 1921 tax was clearly an excise tax on the *sale* of liquid fuel. The new sections added by the 1923 act clearly impose a tax on the *use* of liquid fuel in operating motor vehicles on the roads. The connection of this tax with the state highway program is further emphasized by the fact that the next legislation on the subject is found in an act relating to the public highways (chapter 88, Laws of 1929, p. 159), the short title of which is "Highways." An additional tax of one cent per gallon is imposed in this highway act, and it is provided:

Sec. 4, p. 161. "Every person, firm, or corporation, including distributors, who shall *use* liquid fuel for the purpose of operating motor vehicles, including motor trucks, upon the public highways of the state, or the political subdivisions thereof, . . . shall pay a tax of one cent per gallon in addition to the tax imposed by section 2 of chapter 81 of the Laws of 1923, . . . upon all such liquid fuel *so used*, . . ." (Italics above and elsewhere in this opinion are supplied.)

It is further provided in this chapter that the revenue produced by the additional cent so provided should be placed in a fund which is known as the "lateral highway fund," to be divided among the counties of the state to be used in the construction and improvement of lateral highways.

The next act relating to the subject is chapter 140, Laws of 1931, p. 430. This raised the tax to four cents per gallon "upon all such liquid fuel so *used*," that is, used in operating motor vehicles upon the public highways of the state. This act was followed by chapter 58, Laws of 1933, which, as amended in 1935, 1937, and 1939, is the existing law. The short title of this act is "Petroleum Products: Tax and Regulation." The act provided that distributors of motor vehicle fuels and other petroleum products should be licensed and bonded; and,

Sec. 5, p. 305. "Every distributor shall pay, in addition to any other taxes provided by law, an excise tax to the treasurer of this state of five (5) cents for each gallon of motor vehicle fuel sold, distributed or used by it in the State of Washington. . . ." Rem. Rev. Stat. (Sup.), § 8327-5 [P. C. § 7068-75].

But, of the sums so paid, it was the legislative intention that the state should retain as taxes only that portion paid with reference to fuel used to propel motor vehicles on the highways. This is conclusively shown by § 18 (a), p. 320, which reads, in part, as follows:

"*Any person* who shall use any motor vehicle fuel as herein defined for the purpose of operating or propelling stationary gas engines, farm tractors, aircraft, or boats or *who shall purchase and use any such fuel* for cleaning or dyeing or other use of the same, *except in motor vehicles operated or intended to be operated upon the public highways of the state,* or export the same for use outside of this state, and who shall have paid any license tax for such motor vehicle fuel hereby required to be paid, either directly to the vendor from whom it was purchased or indirectly by adding the amount of such license tax to the price of such fuel, *shall be reimbursed* . . ." etc.

When one reads the italicized portions of the above quoted section consecutively,

39

"Any person . . . who shall purchase and use any such fuel . . ., except in motor vehicles operated or intended to be operated upon the public highways of the state, . . . shall be reimbursed,"

it becomes manifest that the legislature of 1933 continued to adhere to the just and reasonable policy which governed its predecessors, to-wit: That the burden of special taxes created and imposed to raise funds for the construction and upkeep of the costly and highly specialized highways suitable for motor vehicle traffic ought to be borne by those who use the highways for that traffic.

It will be noted also that the act of 1933 retained the exact formula prescribed by the original act of 1923 for distinguishing and dividing the taxable from the ultimately non-taxable. In each act, the persons who used the gasoline for any purpose, "except in motor vehicles operated or intended to be operated upon the public highways of the state," are declared to be entitled to refunds. That formula, had it not been changed by the 1935 amendment (to be considered later), would have been of easy application to the trucks of the plaintiff. To say nothing of excess weight, the bodies of the least of them are eight feet four inches in width, and it is the same distance from outside to outside of the rear wheels. From this, they run up to a body width of nine feet two inches, with a width at the rear wheels of nine feet three inches. Presumably, no one would contend that such trucks were *"intended"* to be operated on the public highways of the state, in view of the fact that, at the time they were constructed, and for some years after, a criminal statute, reinforced by heavy penalties for its infraction, provided that:

"No vehicle whose width over all, including load, exceeds eight feet shall be driven over or on a public highway (farm machinery moving from one farm or

section of farm to another not included) . . ."
Laws of 1929, chapter 180, p. 464, § 5; Vol. 7, Rem. Rev.
Stat., § 6362-10; superseded by a similar statute on
April 1, 1937. See Laws of 1937, chapter 189, p. 870,
§ 47, Rem. Rev. Stat., Vol. 7A, § 6360-47 [P. C.
§ 2696-818].

The application of the formula or test, "except in
motor vehicles operated or intended to be operated
upon the public highways of the state," was not always
so clear. Under the 1933 act, claims for refunds were
made by owners of motor vehicles which were qualified
to operate on the highways on the ground that they
had not been so operated, and that the owner had not
intended that they should be. In short, it was con-
tended that the intention of the owner furnished the
test. If such a construction of the statute could, and
should, be upheld, it would obviously be a simple
matter for dishonest persons to defraud the state by
collecting refunds of tax paid with respect to gasoline
which had in fact been used on the highways. Appel-
lant argues that it is a reasonable inference that this
is the reason the legislature changed the formula in
1935, in amending § 18 of the 1933 act by § 2, chapter
109, p. 271. The section, as so amended, reads, in part,
as follows:

"Any person who shall use any motor vehicle fuel as
herein defined for the purpose of operating any internal
combustion engine not used on nor in conjunction with
any motor vehicle *capable of being operated upon a
public highway,* and as the motor power thereof, upon
which motor vehicle fuel excise tax provided for in this
chapter has been paid, shall be entitled to and shall
receive a refund of five (5) cents for each gallon of
motor vehicle fuel so used."

In 1937, the legislature, by § 2 of chapter 219, p.
1088 (Rem. Rev. Stat. (Sup.), § 8327-18 [P. C.
§ 7068-88]), again amended § 18 of the 1933 act, as

amended by the 1935 act, but the formula adopted in the 1935 amendment remained the same; that is to say, refunds were to be made with respect to taxes paid on motor vehicle fuel

" . . . not used on nor in conjunction with any motor vehicle capable of being operated upon a public highway, . . ."

■■ The major question presented by this case is: Did the legislature, by the 1935 amendment, intend to extend the scope of the act and tax the use of gasoline in vehicles not actually operating on the highways; or did it, as the appellant contends, intend only to more adequately insure that no refund should be made of taxes paid with respect to gasoline which had, in fact, been used on the highways? The state contends that this court has heretofore squarely decided the question contrary to the appellant's contention in the case of *Elliott & Co., Inc. v. State*, 191 Wash. 385, 71 P. (2d) 168.

Elliott & Company's trucks were used in road construction work. They had, as the opinion shows, removable, extra rear wheels. Without the extra wheels, they could legally operate on the highways, and did so. When the extra wheels were bolted on, as was done when engaged in construction work, the opinion says:

"In width, the trucks exceed the lawful limit of trucks to be operated on the highways by fifteen inches. . . . They were not used, and could not *legally* be used, on the highways unless the outside wheels were removed. . . .

"Under the clear language of the statute, 'any motor vehicle capable of being operated upon a public highway,' the appellant is not entitled to a refund as *the trucks are capable of being used and were operated on the public highway.* As stated by the trial court in its memorandum opinion:

" 'The trucks without the extra wheels are capable

of being so used. The evidence shows that they were so used. The attachment of the extra wheels for the special purpose for which the trucks were used for construction work does not change the character of the machine so as to avoid the tax. It is a very different situation from that of a tractor, steam-shovel, or the like, which are not propelled over the highways by their own power.'"

We quote the final paragraph of the opinion which contains the decision of the court:

"Each of appellant's trucks is a complete unit without the extra wheels or extra body. *As such, each truck is legally and physically capable of being operated on the public highways, empty or with a small load.* By the addition of extra equipment, the appellant may not transform his trucks into tractors and thereby avoid payment of the tax in question. *We agree with counsel for respondent that the 1935 enactment (chapter 109, Laws of 1935) expresses clearly the intention of the legislature to prevent the granting of any refund of taxes paid on gasoline consumed in any truck which is capable in any form of being operated upon a public highway.*"

In that case, the trucks operated on the highways and were in every way "capable" of doing so, except when their form was changed by bolting on the extra wheels. In this case, in our opinion, the appellant's trucks were not "capable in any form" or at any time "of being operated upon a public highway."

The lower court's conclusion of law and judgment are based wholly upon the following finding of fact:

"That the trucks used . . . are motor vehicles of too great dimensions and weight to be lawfully operated upon the public highways of the state without a permit from the state highway department, but the court finds that a permit was granted and said trucks were in fact operated under their own motive power upon the public highways of the state of Washington."

It is contended that this is a finding that the trucks operated on the highway, both legally and physically, and, therefore, that it fully and completely supports, and indeed compels, the conclusion of law arrived at by the court, and upon which the judgment was based, that they were "motor vehicles capable of being operated upon a public highway." We do not think that, under a reasonable interpretation of the statutes, these trucks "operated" on the highway when proceeding from Seattle to Grand Coulee. It is true they traveled over a highway and under their own power, but they were compelled to move under special permits from the state highway engineer, and were required to, and did, proceed in caravans, over a specified route at slow speed at a specified time, *entirely empty*, and with flagmen leading the van and following at the rear. In our opinion, the word "operated," as used in the statute, contemplates normal, functional operation. The trucks involved in this case were not "in any form" capable of such operation on a highway.

It appears in evidence that there was, or had been, a portion of state highway within the Grand Coulee Federal reservation, and that these trucks, while working there, crossed it and, at times, apparently, traveled upon it for a short distance, and to its great damage. It further appears from correspondence in the record that the state highway department took the position that this piece of road was within the Federal reservation, and that it was the duty of the United States to repair and maintain it. The Federal authorities answered that, since the road was still used by the general public, repairs were for the state's account. The state highway department stood its ground and continued to assert that the Federal government had sole jurisdiction of the road, saying:

"By reason of the unusual operation which is involved in connection with the construction of the Coulee Dam and the impossibility of establishing the same control on this highway as obtains on other state highways, this department will assume no responsibility whatever for the maintenance of the road through the area owned by the Federal government and under its control."

The Federal authorities apparently accepted this view of the matter. At any rate, they demanded that the appellant in this case repair the road, and it did so. It is now argued that the limited operation over this piece of road constituted an operation over a state highway. But the trial court did not so hold. It made no finding whatever on the matter, presumably because it could not determine from the evidence in the record, as we cannot, whether or not the road involved remained a state highway after the Federal reservation was established.

But if it be conceded that it did remain a state highway, it is clear that the appellant's trucks were not legally capable of operating upon it, and there is considerable evidence tending to show that, in a very real sense, they were not even physically capable of doing so. This evidence is to the effect that the road would not support the trucks when loaded; and that, in constructing roads for these trucks to operate on, it was found necessary to put down from two to six feet of crushed rock in order to have them hold up under the heavy loads. A truck can scarcely be said to be physically capable of operating on a highway if that highway will not carry it when loaded.

In our opinion, the appellant is entitled to the relief sought in its complaint. In enacting the 1935 amendment, the legislature did not intend to abandon the long-established general policy that the burden of gasoline taxes should be borne exclusively by those

who use the roads for motor vehicle traffic. No intention appears to limit the right to a refund of tax payments made with respect to gasoline not used in propelling motor vehicles upon the highways of the state. The 1935 amendment was enacted to insure that no refunds should be made of taxes paid with respect to gasoline *actually* used on the public highways. To leave the right to a refund dependent upon the intention of the owner, or to make it depend upon his mere statement that he had not used the gasoline on the highway, would not accomplish that purpose. Some kind of a purely objective method of determination was necessary, and so it was provided in the amendment that no refund should be made if the vehicle in which the gasoline was used was "capable of being operated upon a public highway."

In the *Elliott & Co.* case, *supra,* as the court found, the trucks were capable of being operated on the highways, and were so operated, except when their extra wheels were bolted on. But if a refund were to be allowed with respect to the gasoline used while the extra wheels were bolted on, the objectivity of the test would be completely lost, for the state could not keep the trucks under constant observation and would be compelled to rely, as before, upon the word of the owner. Hence, the court, appreciating the purpose of the amendment, held in that case:

"We agree with counsel for respondent that the 1935 enactment (chapter 109, Laws of 1935) expresses clearly the intention of the legislature to prevent the granting of any refund of taxes paid on gasoline consumed in any truck which is capable in any form of being operated upon a public highway."

Since the trucks in this case were not capable "in any form" or at any time "of being operated upon a

public highway," the decision in the *Elliott & Co.* case is not in point.

The refund must be allowed. The prayer for relief being in the alternative, it will be for the trial court to determine in what form it shall be accorded.

The judgment appealed from is reversed, and the cause remanded to the trial court with directions to enter findings, conclusions of law, and judgment consistent with this opinion.

JEFFERS, STEINERT, and MAIN, JJ., concur.

BLAKE, C. J. (dissenting)—I think the judgment of the trial court was in accord with the holding of this court in *Elliott & Co., Inc. v. State*, 191 Wash. 385, 71 P. (2d) 168. I therefore dissent.